UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| HERSHEL WOODROW "WOODY" WILLIAMS, | § § § | |
| PLAINTIFF, | § § | |
| V. | § § | CIVIL ACTION NO. 3:19-CV-00423 HONORABLE JUDGE CHAMBERS |
| BRYAN MARK RIGG AND JOHN DOE PUBLISHING COMPANY, | § § | |
| DEFENDANTS. | § § | |

**BRYAN RIGG'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
ORIGINAL VERIFIED COMPLAINT**

DEFENDANT Bryan Rigg, by counsel, hereby submits his Memorandum in Support of

Motion to Dismiss Original Verified Complaint pursuant to Federal Rules of Civil Procedure 8(a)

and 12(b)(6) for failure to state a claim upon which relief may be granted.

**I.**

**INTRODUCTION**

Plaintiff's suit is meritless.  Mr. Rigg, an accomplished historian, has spent the last four

years working on his newest book which covers the Pacific campaign in World War II.  Plaintiff,

a historical figure, is featured in the book and has been interviewed by Mr. Rigg numerous times.[1]

While Plaintiff initially welcomed the attention, after several years of work on the book he began

to demand monies.  As that topic was being discussed and written contracts being exchanged,

Plaintiff became aware that Mr. Rigg's historical research was revealing some previously

undiscussed aspects of his life and service.  When Mr. Rigg refused – as a historian – to ignore the

---

[1] This is nothing unusual, of course, as Plaintiff regularly gives interviews and speeches about his past as even the
most rudimentary Google search demonstrates.

documented facts, Plaintiff filed suit in an effort to prevent this book from being published and hide the truth.  Plaintiff's claim, however, fails as a matter of law as any alleged contract (or promissory estoppel claim) is – besides being clearly refuted by the various draft written contracts and correspondence exchanged between the parties – barred by the statute of frauds.  Similarly, Plaintiff's claim for harm to his right of publicity is inapplicable to historical biographies such as presented here.  Finally, Plaintiff's claim for conversion is not pled to give Mr. Rigg notice of the claim.  The Court, therefore, should dismissed the Original Complaint in its entirety.

## II.

## BACKGROUND FACTS

Mr. Rigg is an award-winning historian who has received considerable acclaim for his books on World War II.  His hallmark is his thorough research, incredible detail, and insistence on primary proof of the facts he presents.  His books all have hundreds of footnotes that cite to the documentary evidence that he develops while researching and writing about his subjects.  As a former United States Marine who obtained history degrees at Yale and Cambridge, Mr. Rigg developed a keen academic interest in World War II and has published four books detailing his new discoveries in the area.

### A.        Mr. Rigg Begins New Book and Meets Plaintiff.

In 2015, Mr. Rigg had decided to write a new book about the Pacific campaign of World War II.  As part of his research, he began interviewing numerous veterans and gathering their written materials – both American and Japanese – about their experiences in the war and he traveled to numerous archives throughout the world in China, Japan, Guam, Germany and the United States to gather primary source materials.  As part of his work, he traveled to Guam and

Iwo Jima with several Americans who had fought on the islands.  While there, he met Plaintiff in 2015.

Plaintiff is currently a 96-year old living legend.  Plaintiff was drafted into the Marines in 1943 and was sent to the Pacific theater where he saw action at the Battle of Guam.  In February of 1945, he fought at the Battle of Iwo Jima as a corporal and earned renown for his use of a flamethrower to destroy enemy pillboxes in battle.  For his heroism, he was awarded the Medal of Honor, the highest U.S. military decoration for valor, which was personally pinned on him by President Harry Truman at the White House on October 5, 1945.

Mr. Rigg was pleased to meet Plaintiff and interviewed him numerous times for the book he was writing.   Plaintiff was gracious, willing to talk, and shared stories from his life.  While most of those stories had already been reported – not surprisingly, Plaintiff has been interviewed for hundreds (if not thousands) of articles about his life and exploits – Mr. Rigg began to think that Plaintiff's life could provide an effective vehicle to tell readers the stories of all the servicemen who fought in the campaigns mentioned above

Thus Mr. Rigg quickly decided that the book he was writing about the Pacific campaign would tell the stories of many brave Marines and Sailors and would spend considerable time talking about two men on opposite sides of the Battle of Iwo Jima: Plaintiff and Japanese General Tadamichi Kuribayashi.

### B.    Mr. Rigg Begins the Long Process of Research and Writing His Book.

Critically, as Plaintiff knew and was repeatedly told, Mr. Rigg is a historian.  Mr. Rigg is not a biographer and he does not write accounts of people's lives as they tell them.  Facts are researched, the truth is discovered and supported with evidence, and facts – both good and bad – must be told.

Plaintiff placed no limitations on Mr. Rigg and asked for nothing.  While researching the book, Mr. Rigg interviewed fifty-six subjects, including Plaintiff.  Mr. Rigg also traveled around the world locating primary source material on the war.  Mr. Rigg interviewed Plaintiff numerous times and, each time, conducted further research or interviews as needed to flesh out the stories or find support for the facts mentioned by Plaintiff.  For example, Plaintiff was very adamant that Mr. Rigg interview Corporal Darol E. "Lefty" Lee who Plaintiff claimed was a witness to all his heroic acts on Iwo Jima.  Indeed, prior to Mr. Rigg, Cpl. Lee had been interviewed numerous times about Plaintiff and has constantly shared stories of Plaintiff's heroism that he personally witnessed. However, during his research, Mr. Rigg found out that Cpl. Lee had lied about his experiences on Iwo Jima and never witnessed anything Plaintiff did while fighting on the island (as Cpl. Lee was aboard the USS Bayfield being treated for "combat fatigue/shell shock" on the day in question). In fact, Mr. Rigg's discovery helped the World War II Museum stop a historical documentary it was about to do about Plaintiff and Cpl. Lee once they saw that Cpl. Lee was a "Stolen Valor" case who lied about his combat experiences.  This is just one example showing why Mr. Rigg insists on first-hand evidence and has earned a reputation for finding information and separating fact from fiction.

When Mr. Rigg began to write the book, he shared various early drafts with Plaintiff to obtain his comments and thoughts.  Plaintiff would occasionally suggest edits or clarifications that Mr. Rigg would accept or not as he saw fit.

Although historical accounts are rarely commercial successes, Mr. Rigg began to think that this book would present a compelling story.  As he shared drafts of the book with potential publishers and editors, his thoughts were confirmed.  As such, he began to raise with Plaintiff the

idea of doing publicity for the book together.  Suddenly, something changed with Plaintiff and those close to him.

C.    **Plaintiff Requests a Contract and Money.**

In February of 2017, approximately two years (and twelve interviews of Plaintiff) after they first met, Mr. Rigg attended a meeting of Plaintiff's family.  The book was on draft nine, which had already incorporated the interviews and comments to date.  During that meeting, Mr. Rigg suggested that, should the book be successful, he would like to donate some of the proceeds to the Plaintiff's charity, the Herschel "Woody" Williams Medal of Honor Foundation ("HWWMOH Foundation").  This was the first time money was ever discussed between Plaintiff and Mr. Rigg.  (That meeting was recorded by Plaintiff and any listening of that recording will confirm both that fact and what happened next.)

The mention of money and the possible success of the book changed the entire tenor of the conversations.  Suddenly, those around Plaintiff – especially his heirs – shifted the entire conversation to money and the sharing of proceeds.  After the meeting concluded, Plaintiff and Mr. Rigg discussed the issue further as they drove around.  Mr. Rigg noted that it would be extremely unorthodox for a historian to share book proceeds with a subject in the book, as such an arrangement might lead to accusations that the book was not historically accurate.  Nonetheless, due to the extreme respect that Mr Rigg had developed for Plaintiff, he indicated that he was willing to discuss an agreement whereby royalties from the book could be shared with the HWWMOH Foundation and used to honor Gold Star Families after expenses were recuperated.

In that regard, Mr. Rigg had his attorney draft up an agreement which he sent to one of Plaintiff's grandsons.  That grandson, Mr. Casey, then sent back an agreement that was utterly

unacceptable as it suddenly assumed that Mr. Rigg was acting as a personal writer of a biography rather than a historian.

Drafts of proposed contracts went back and forth for more than a year with no agreement ever being reached.  Plaintiff's representatives kept adding additional terms that they wanted, many of which Mr. Rigg could not accept.

By January of 2018, the book was on draft nineteen and was still evolving.  Nonetheless, no contract could be agreed to as Plaintiff's grandsons kept changing the proposed agreement. Plaintiff's main attorney, Dale Egan, confided in Mr. Rigg that he was as frustrated with the grandchildren as Mr. Rigg was.

On March 7, 2018, negotiations finally broke down and all offers were withdrawn.  By mid-May of 2018, Plaintiff and his grandchildren began to threaten legal action.  One of Plaintiff's grandsons demanded that Mr. Rigg sign a contract or he would make sure the book was never published and would tell everyone that Mr. Rigg was a liar.  When rebuffed by Mr. Rigg, Plaintiff contacted Mr. Rigg's then publisher and stated he would sue them if any book was ever published without compensation to Plaintiff.  That publisher, unwilling to face suit, withdrew from its contract with Mr. Rigg.

D.    **Plaintiff's Children Threaten to Sue Over Money; Plaintiff Threatens to Sue Over the Truth.**

At the same time, some members of Plaintiff's family began to express concern over certain facts that were being discovered about Plaintiff.

The more research Mr. Rigg did for the book, the more discrepancies appeared.  As to Plaintiff, while much of this could be ascribed to a 90+ year old individual trying to recall facts from more than seventy years ago, the simple fact is Plaintiff – while undoubtedly a heroic and legendary figure – has uttered many statements over the years that simply were proving to be false.

For example, Plaintiff had always insisted that he volunteered for service as soon as he could (and that his height kept him from volunteering earlier).  But the government's records clearly show both that the height requirement was not an impediment to his service and that, rather than volunteering, Plaintiff was drafted.  Moreover, there are problems with Plaintiff's story of how one of his friends, Vernon Waters, died; how many children his mother had and how many died; how he behaved with his girlfriends; how he remembered his platoon commander, Howard Chambers; how he reported his actions on Iwo Jima; how he has changed his story since a *Man's Magazine* article in 1966; and how he remembered actions on Guam.  Of more concern, however, was what the historical records said about Plaintiff's Medal of Honor.

To be clear, all of the research performed by Mr. Rigg shows that Plaintiff was a true hero on Iwo Jima.  However, there are numerous discrepancies and unusual circumstances that surround Plaintiff being awarded the Medal of Honor.  (Purely as one example, Plaintiff was the only Iwo Jima Medal of Honor recipient who never received an endorsement for the award from either the Fleet Marine Force, Pacific Commander, Lt. General Roy S. Geiger, and his board; Marine Corps Commandant Alexander A. Vandegrift; or the Pacific Fleet Commander, Admiral Chester Nimitz, and his board, all of whom were concerned about the lack of evidentiary support for Plaintiff's actions.)  Indeed, many of the "facts" that were put into the draft of his Medal of Honor citation had to be dramatically altered at the last moment, right before President Truman signed off on the award, due to unsubstantiated facts having to be removed, many of which seem to have been entered into the historical record due to Plaintiff's self-reporting of the event.  Moreover, had these original "facts" not been put into the record, there was a good chance that Plaintiff's captain would never have recommended him for the Medal of Honor.

As a historian, Mr. Rigg felt the need to accurately report the facts as he discovered them. Plaintiff's representatives, however, were only interested in articles that were fully flattering to him.  Once made aware of the discrepancies in the book, they tried to shut it down.

Plaintiff had his lawyer write to Mr. Rigg in early 2018 and demand that Mr. Rigg cease writing anything about Plaintiff.  Mr. Rigg refused but, wanting to make sure of the accuracy of the book, he asked Plaintiff to let him know of any inaccuracies that he saw contained in the latest draft of the book (draft twenty-three) so that they could be corrected.  Plaintiff did not respond.

Plaintiff also asked for the return of all materials he had loaned to Mr. Rigg.  While it took some time to gather them all, Mr. Rigg eventually sent them to Plaintiff.

Mr. Rigg's book has undergone numerous revisions since discussions with Plaintiff ended. Although the book still has a lot of information about Plaintiff, it is now much more than a book about just one Marine.  Much of the book is now focused on many other heroic Marines and American commanders.  Moreover, the book also focuses on General Kuribayashi and Japanese atrocities that were committed under his command and under the command of his fellow officers. Significant controversy arose over some of the facts discovered about General Kuribayashi, and numerous groups have asked Mr. Rigg to not report those facts for fear of angering the Japanese government.  Mr. Rigg has not given in to such threats since they violate the First Amendment and the pursuit to remember the victims of fascist regimes of World War II.

Mr. Rigg had assumed that the only controversy surrounding his book was the reported facts about General Kuribayashi until he received the Original Complaint here that asks for an injunction to prevent the publication of Mr. Rigg's book.

As noted below, other than the facts that all of the documents – and the recordings of their meetings – exchanged between the parties show that the facts outlined in the Complaint are false, the Complaint should be dismissed as it fails as a matter of law.

### III.
### ARGUMENT AND AUTHORITIES

Plaintiff has filed suit alleging causes of action for breach of contract, promissory estoppel, interference with right of publicity, and conversion and is seeking a prior restraint injunction to prevent Mr. Rigg from publishing his book.  Under the standards set forth by the United States Supreme Court, a plaintiff must provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and internal quotation marks omitted). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks, alterations, and citation omitted). Although a court must take "well-pleaded factual allegations" as true for purposes of a Rule 12(b)(6) motion, allegations that are simply legal conclusions "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679 (emphasis added). Where, as here, a plaintiff has "not nudged [his] claims across the line from conceivable to plausible," the complaint "must be dismissed." *Twombly*, 550 U.S. at 570.  For the reasons stated below, these claims fail as a matter of law.

### A.      Plaintiff's Causes of Action for Breach of Contract and Promissory Estoppel are Barred by West Virginia's Statute of Frauds.

Plaintiff's causes of action for breach of contract and promissory estoppel are barred pursuant to the statute of frauds.  The applicable statute of frauds holds that "[n]o action shall be

brought . . . upon any agreement that is not to be performed within a year . . . unless the offer, promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged thereby or his agent."  W. VA. CODE § 55-1-1(f).  The issue of whether an alleged agreement is unenforceable under the statute of frauds is a question of law for the Court.  *Commonwealth Film Processing, Inc. v. Courtaulds U.S., Inc.*, 717 F. Supp. 1157, 1159 (W.D. Va. 1989).  Here, the alleged oral agreement is barred.

The purpose of the statute of frauds is critical in cases like this.  As the Supreme Court of Appeals of West Virginia explained:

> The purpose of the statute of frauds was and is to make difficult the establishment of perjured and fraudulent claims.  The method of making perjured claims difficult, under this type of statute, is to refuse to admit oral testimony as to the existence of terms of certain classes of contracts.  The statute reflects a judgment that parol evidence of certain types of agreements is so inherently suspect that it should not even be presented to a jury, an institution otherwise generally considered capable of distinguishing fact from invention. On these matters, the statute implies, even a jury cannot be trusted to recognize truth.

*Thompson v. Stuckey*, 300 S.E.2d 295, 298 (W. Va. 1983) (internal quotes and citations omitted). Indeed, wanting to stress the importance of the statute of frauds, West Virginia mandates that for any situation where a party claims the existence of an oral contract that was not performed in a year – as here – the plaintiff must present "clear and convincing evidence" of such oral contract before it can be presented to a jury.  *Id.*; *accord Yanero v. Thompson*, 342 S.E.2d 224, 226 (W. Va. 1986).  Here, the statute of frauds prevents Plaintiff's cause of action.

First, there is no dispute that there is no signed contract between the parties.  Indeed, the parties circulated draft contracts back and forth for more than a year – and they do not match the terms that Plaintiff's Complaint alleges were agreed to verbally some time before – but no agreement could be reached.

Second, the contract was not "to be performed within a year." Mr. Rigg recognizes that the standard for reviewing such claims is not whether the contract was performed in a year, but rather whether the contract could be performed within a year, even if only by some improbable event. *See Thompson*, 300 S.E.2d at 297. However, even under this liberal test, the alleged oral contract fails.

According to the Complaint, the alleged oral agreement had five terms: (1) Plaintiff would collaborate with Mr. Rigg; (2) Mr. Rigg would use that information plus whatever else he found on his own research, to write a book; (3) the information would be factual; (4) both parties would have input into, and authority over, the content of the book; and (5) the parties would share equally in the profits of the book. Complaint ¶ 43. While, as a fact, items 1-4 could never be completed in a year (as historical treatises take years to research, write, and edit), Mr. Rigg concedes that under the "remotely possible" standard, the Court must imagine a historical treatise that could be somehow researched, written, and printed within a year. However, even with that suspension of belief, the contract would still be barred under the statute of frauds due to the final term.

The key term of Plaintiff's claim is that he is entitled to share in the profits of the book in perpetuity. Thus, Plaintiff concedes that he is to be paid for decades as every book sale brings him his share of the royalties. It is for this reason that courts around the country have held that oral agreements to share profits for the sales of books, records, and movies fall within the statute of frauds because they necessarily cannot be performed within a year. *See, e.g.*, *Grossberg v. Double H. Licensing Corp.*, 86 A.D. 2d 565, 566 (N.Y. App. 1982) (pursuant to an alleged oral agreement to share profits for a record, "defendants' liability endured so long as a single record of the [] performance was sold anywhere in the world. In these circumstances the agreement could not be performed within one year and the statute is applicable"). Under Plaintiff's alleged oral agreement,

he would get his share of the book royalties every time a book was sold. As courts have repeatedly held, such contracts are barred by the statute of frauds.[2]

That same thinking applies to other alleged contracts for the sharing of profits that are of such indefinite duration. *See, e.g.*, *United Beer Distrib. Co., Inc. v. Hiram Walker (N.Y.) Inc*., 163 A.D.2d 79, 80 (NY App. 1990) ("Since the agreement called for performance for an indefinite duration and could only be terminated within one year by its breach during that period, it is not one which by its terms could be performed within one year."); *Computech Int'l, Inc. v. Compaq Computer Corp*.,2002 U.S. Dist. LEXIS 20307, at *3 (S.D.N.Y. Oct. 24, 2002) ("[C]ontracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds"); *Madison Oslin, Inc. v. Interstate Res., Inc.*, No. MJG-12-3041, 2015 U.S. Dist. LEXIS 37587, at *16-17 (D. Md. March 25, 2015) (holding that oral joint venture could not be performed within a year as it involved profit payments that, by their nature, were long term).

Moreover, because the statute of frauds bars Plaintiff's contract claim, his claim for promissory estoppel fails as well. As the Supreme Court of Appeals of West Virginia has held

> Where, as here, the alleged "promise" is identical in substance to the terms of the alleged oral agreement and the performance requested is the performance of the terms of the oral agreement, a litigant cannot escape the application of the Statute of Frauds to that oral agreement through the mere expediency of asserting "promissory estoppel."

*Long v. Long*, No. 11-0865, 2012 W. Va. LEXIS 445, at *3 (W. Va. June 8, 2012); (citing *Paper Corp. of the U.S. v. Schoeller Technical Papers. Inc*., 724 F. Supp. 110, 118 (S.D.N.Y. 1989)).

---

[2]    Further, although an agreement capable of indefinite continuance may not fall within the Statute of Frauds where it can be terminated by either party at any time, *Am. Credit Servs., Inc. v. Jay Robinson Chrysler/Plymouth, Inc*., 206 A.D.2d 918 (N.Y. Supp. 1994), the types of agreements like those in this case in which one party's continued liability is "wholly dependent upon the act of [a] third party," *i.e.*, those purchasing the records, are held to be unenforceable under the Statute of Frauds, *Levine v. Zadro Prods., Inc*., 2003 U.S. Dist. LEXIS 9637, at *4 (S.D.N.Y. 2003) (internal quotes and citation omitted).

Because the alleged oral agreement involved the payment of book royalties in perpetuity, Plaintiff's causes of action for breach of contract and promissory estoppel are barred by the statute of frauds and must be dismissed.

**B.      Plaintiff Fails to State a Claim for "Interference with Right of Publicity."**

Plaintiff has also asserted a cause of action for "Interference with Right of Publicity."  This cause of action in inapplicable here.

The "right of publicity" is a right that is recognized in many states.  The right is designed to protect the commercial value of the names and likenesses of famous figures.  *Haelan Labs., Inc. v. Topps Chewing Gum, Inc*., 202 F.2d 866, 868 (2nd Cir. 1953).  Specifically, the right is an "injury to the pocketbook" of a celebrity who contends that he should have been allowed to profit on the sale of his likeness or performance.  *Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1446 (11th Cir. 1998).  As the Supreme Court has noted, the right of publicity is designed not to provide privacy, but to ensure that an entertainer can still profit.  *Zacchini v. Scripps-Howard Broadcastibng Co*., 433 U.S. 562, 573 (1977).  Thus, while a television station may freely report on a performance by an entertainer, it may not show the entre performance to which the entertainer normally charges admission to watch.  *Id.*  This right is not relevant here.

First, it is critical to note that West Virginia has not formally recognized such a cause of action.  The right of publicity is a state law claim.  *C.B.C. Dist. & Marketing, Inc. v. Major League Baseball Advanced Media, L.P*., 505 F.3d 818, 822 (8th Cir. 2007) (citing *Zacchini*, 433 U.S. at 566).  The only mention of the right in West Virginia case law is a footnote in *Crump v. Beckley Newspapers, Inc*., 320 S.E.2d 70, 85 n. 6 (W. Va. 1984).  That being said, at least one court in this district has already determined that such a right would be cognizable in the state.  *See Curran v.*

*Amazon.com, Inc.*, No. 2:07-0354, 2008 U.S. Dist. LEXIS 12479, at *12-13 (S.D.W. Va. Feb. 19, 2008).

However, even if such a right did exist in West Virginia, it would not apply here. The right of publicity cannot stop "the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest" guaranteed by the First Amendment to the United States Constitution. *Time, Inc. v. Hill*, 385 U.S. 374, 382 (1967) (internal citations omitted) (cited by *Curran*, 2008 U.S. Dist. LEXIS 12479, at *25). This district specifically held that any right of publicity in West Virginia does not extend to writings about public figures or matters of legitimate public interest. *Curran*, 2008 U.S. Dist. LEXIS 12479, at *25-26 (citing to *Crump*, 320 S.E.2d at 85; *Rosemont Enterprises, Inc. v. Random House, Inc*., 294 N.Y.S.2d 122, 129 (1968) ("Just as a public figure's 'right of privacy' must yield to the public interest so too must the 'right of publicity' bow where such conflicts with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest.")). As one commentator wrote:

> Courts long ago recognized that a celebrity's right of publicity does not preclude others from incorporating a person's name, features or biography in a literary work, motion picture, news or entertainment story. Only the use of an individual's identity in advertising infringes on the persona.

George M. Armstrong, Jr., *The Reification of Celebrity: Persona as Property*, 51 LA. L. REV. 443, 467 (1991) (citing *Rogers v. Grimaldi*, 695 F. Supp. 112, 121 (S.D.N.Y.1988), *aff'd*, 875 F.2d 994 (2d Cir.1989)).

There can be no doubt that the First Amendment bars Plaintiff's claim here. Mr. Rigg is a historian writing a book about history. Plaintiff is a public figure. This district has already held that the public interest exception of the First Amendment applies to books, such as this. *Curran*, 2008 U.S. Dist. LEXIS 12479, at *28 (citing *Dallesandro v. Henry Holt & Co*., 4 A.D.2d 470, 471 (N.Y. Supp. 1957)). Indeed, allowing the "right of publicity" to prevent historians from

researching and writing biographies of historical figures would be catastrophic.  That is why courts routinely hold that any right of publicity does not extend to unconsented works of an individual's life story, such as an unauthorized biography.  *E.g.*, *Matthews v. Wozencraft*, 15 F.3d 432, 436 (5th Cir. 1994) (no right to privacy related to publication of biographical novel); *Rosa & Raymand Parks Inst. for Self Dev. v. Target Corp.*, 90 F. Supp. 3d 1256, 1263 (M.D. Ala. 2015) (no right to publicity related to sale of biographical books and movies of Rosa Parks); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (no right of publicity for founding member of Black Panthers to prevent movie and book about his accomplishments); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 47 cmt. (1995). ("[T]he right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography").

Because the law clearly allows Mr. Rigg to include information about Plaintiff in a historical novel about the Pacific campaign in World War II, the cause of action for right of publicity must be dismissed.

### C.     Plaintiff Fails to State a Claim for Conversion.

Plaintiff has also asserted a cause of action for conversion.  This claim, however, fails to identify with any particularity is not properly pled.  Pursuant to FED. R. CIV. P. 8(a), a party's complaint must state the grounds for their cause of action and put the defendant on notice so that he can defend himself.  If such is not done, a party can move for a more definite statement under FED. R. CIV. P. 12(e).

Here, Mr. Rigg has no earthly idea what he is alleged to have converted.  To the best of his knowledge, Mr. Rigg has no property of Plaintiff.  In the Compliant, Plaintiff says he is the "owner of the items of the personal property identified and described herein."   Complaint ¶ 65.  The

Complaint further states that those items of personal property include "handwritten journals, notes, photographs, and artifacts." *Id.*  No further description is provided.

Mr. Rigg has no idea what Plaintiff is referring to.  To the extent he has ever had any of Plaintiff's property, he has returned it (including gifts he was given by Plaintiff).  If Plaintiff believes Mr. Rigg has any of Plaintiff's property, Mr. Rigg would happily return it.  But he cannot do so when Plaintiff does not identify the property allegedly converted.  The Plaintiff's complaint fails to state what exactly was converted, when the alleged conversion occurred, or what acts Plaintiff alleges constitution exerting wrongful dominion over Plaintiff's property.  In fact, it is alleged by the Complaint that the property was willfully provided to Mr. Rigg.  There is an allegation that Mr. Rigg "refused" to return the property, but no allegation that there was a request to return the property or that Mr. Rigg was made aware of Plaintiff's desire to have the property returned, or what the property was.  The Court, therefore, should dismiss the conversion claim. But, if the Court finds these allegations do state a claim upon which relief should be granted, the court should at least order Plaintiff to identify the items that he contends are in the possession of Mr. Rigg.

Moreover, Plaintiff has pled for damages that may not be recovered in his conversion claim.  In the complaint, Plaintiff states that his damages include "expenses incurred in pursuing the property." *Id.* ¶ 70.  These damages – such as for attorney's fees – are not recoverable in a conversion claim and must be dismissed.  *See Belknap v. Baltimore & O. R.R.*, 91 S.E. 656, 661 (W. Va. 1917) (noting that the only damages that may be recovered for conversion is any loss of value and loss of use).

### D.    <u>Plaintiff's Claim for Injunctive Relief is Not an Independent Claim.</u>

Finally, Plaintiff has asked the Court for injunctive relief and asks the Court to issue a "prior restraint" injunction to prevent the publication of his book.  Obviously, an injunction is a remedy and not an independent cause of action.  Because, as noted above, Plaintiff has not properly pled a valid cause of action against Mr. Rigg, its request for an injunction must fail.

Because the request for injunctive relief is not an independent cause of action, Mr. Rigg will not fully respond to the particular allegations and request for relief at this time.  Should Plaintiff actually seek injunctive relief at some point, however, Mr. Rigg will note that prior restraint injunctions have been repeatedly held to violate the First Amendment.  As the Supreme Court has noted, prior restraints may be issued only in rare and extraordinary circumstances, such as when necessary to prevent the publication of troop movements during time of war, to prevent the publication of obscene material, and to prevent the overthrow of the government.  *Near v. Minnesota*, 283 U.S. 697, 716 (1931).  Nothing of that nature is present here.

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Respectfully submitted,


  /s/ Thomas M. Hancock
Thomas M. Hancock (WV Bar No. 10597)
Alexander C. Frampton (WV Bar No. 13398)
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
949 Third Ave., Suite 200
Huntington, WV 25701
Phone: (304) 526-3500
Email: tom.hancock@nelsonmullins.com
Email: alex.frampton@nelsonmullins.com

**And**

Geoffrey Scott Harper (*pro hac vice* forthcoming)
**WINSTON & STRAWN LLP**
2121 N. Pearl St., Suite 900

Dallas, TX 75201
Phone: (214)453-6476
Email: gharper@winston.com
**COUNSEL FOR DEFENDANT BRYAN
MARK RIGG**


Dated:  October 18, 2019

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | | |
|---|---|---|
| HERSHEL WOODROW "WOODY" WILLIAMS, | § § § | |
| PLAINTIFF, | § § | |
| V. | § § | CIVIL ACTION NO. 3:19-CV-00423 HONORABLE JUDGE CHAMBERS |
| BRYAN MARK RIGG AND JOHN DOE PUBLISHING COMPANY, | § § § | |
| DEFENDANTS. | § § | |

## CERTIFICATE OF SERVICE

This undersigned attorney hereby certifies that a true and correct copy of the foregoing

"*Bryan Rigg's Memorandum in Support of Motion To Dismiss Original Verified Complaint*" was served via the CM/ECF system on the  18th day of October, 2019, which will send notice to the following participants:

> J.H. Mahaney
> Brittany S. Given
> Dinsmore & Shohl LLP
> 611 Third Avenue
> Huntington, WV 25701

 /s/ Thomas M. Hancock
Thomas M. Hancock (WV Bar No. 10597)
Alexander C. Frampton (WV Bar No. 13398)
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
949 Third Ave., Suite 200
Huntington, WV 25701
Phone: (304) 526-3500
Email: tom.hancock@nelsonmullins.com
Email: alex.frampton@nelsonmullins.com

*Counsel for Defendant Bryan Mark Rigg*