```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                       AT HUNTINGTON

_____x
                                :
HERSHEL WOODROW WILLIAMS,       :     Civil Action
                                :
              Plaintiff,        :     No.  3:19-cv-00423
                                :
v.                              :
                                :     Date:  April 6, 2020
BRYAN MARK RIGG, et al.,        :
                                :
              Defendant.        :
_____x


            TRANSCRIPT OF TRO MOTION HEARING HELD
      BEFORE THE HONORABLE THOMAS E. JOHNSTON, CHIEF JUDGE
                UNITED STATES DISTRICT COURT
               IN CHARLESTON, WEST VIRGINIA
                       TELEPHONICALLY

APPEARANCES:

For the Plaintiff:           JOHN H. MAHANEY, ESQ.
(By telephone)               BRITTANY GIVEN, ESQ.
                             Dinsmore & Shohl
                             P. O. Box 2185
                             Huntington, WV 25722-2185

For the Defendant:           THOMAS M. HANCOCK, ESQ.
(By telephone)               Nelson Mullins Riley &
                             Scarborough
                             P. O. Box 1856
                             Huntington, WV 25719-1856




Court Reporter:              Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.
```

                                                    **EXHIBIT A**

1  **Q.**  Okay.  In the course of your time on -- during this
2  trip with Mr. Rigg, did you communicate these requirements
3  to Mr. Rigg?
4  **A.**  Yeah.  We spoke -- we spoke about these things in
5  particular while we were -- while we were there on Guam.  We
6  did -- we did dive into these things, as well as, you know,
7  the fact that if there were any royalties, that that would
8  -- you know, it would be a 50/50 split and that we were --
9  we were both in agreement that in order to move forward once
10 we got back to the States that those, you know, those were
11 stipulations we both understood.
12 **Q.**  And I want to make sure that we're clear.  In terms of
13 your discussions with Mr. Rigg, did he indicate to you that
14 if information was provided to him or that you moved forward
15 with the book that he was in agreement to those terms?
16 **A.**  Yes.  Yes.
17 **Q.**  And that would include that the book be factual and
18 that Mr. Williams would have the right to consent to the
19 final content of the book?
20 **A.**  That's correct.
21 **Q.**  So, that's 2015.  Let's move forward into 2016.  What,
22 if anything, happened in terms of moving this along during
23 the latter part of 2015 as we get into 2016?
24 **A.**  You know, I think that's when the -- the initial
25 manuscripts started flowing between he and Woody.  He was

1   **Q.**   Do you have something that I sent you as Exhibit number
2   2?
3   **A.**   I do.
4   **Q.**   Okay.
5            MR. MAHANEY:  And, for the record, I am referring
6   now to Plaintiff's Exhibit number 2, which is an e-mail that
7   I sent earlier, a series of e-mails.
8            BY MR. MAHANEY:
9   **Q.**   So, let me let you take a look at this.  Do you
10  recognize this series of e-mails?
11  **A.**   I do.
12  **Q.**   Okay.  These are dated in August of 2016.  And would
13  these have been e-mails that you recognized that you would
14  have received and sent to Mr. Rigg?
15  **A.**   Correct.
16  **Q.**   Okay.  Now, if we start at the oldest and move forward,
17  do you see where I'm -- on the last page or next to the last
18  wage where it says, "August 18, 2016 at 11:18 a.m."?
19  **A.**   I do.
20  **Q.**   Okay.  In looking at this, does this refresh your
21  memory that this would have been one of the first drafts
22  that Mr. Rigg would be sending to you and to your
23  grandfather for review?
24  **A.**   Yes.  As a matter of fact, he said in this very first
25  line, "very, very rough draft".

1   **Q.**   Let's turn to the last page here.  It says -- this is
2   the first sentence.  Do you see where it says, "Woody, as
3   you already have proved countless times, let me know what I
4   need to change to make this book kosher, facts and
5   language"; do you see that?
6   **A.**   I do.
7   **Q.**   And was what Mr. Rigg saying here consistent with
8   what your understanding was in terms of the drafts of the
9   book would be submitted to Mr. Williams for his review both
10  in terms of the facts and the language of the book?
11  **A.**   Yes.  It looks like that's what he's made clear here.
12  **Q.**   Okay.  And that's consistent with the understanding in
13  your conversation that you had had with Mr. Rigg?
14  **A.**   Absolutely.
15          MR. MAHANEY:  I'd move the admission of
16  Plaintiff's Exhibit 2 at this time, Your Honor.
17          MR. HANCOCK:  No objection to Plaintiff's
18  Exhibit 2.
19          THE COURT:  All right.  Exhibit 2 may be admitted.
20                  **PLAINTIFF EXHIBIT 2 ADMITTED**
21          BY MR. MAHANEY:
22  **Q.**   Let's move on, if we can, sir.  Do you have Exhibit 4,
23  Plaintiff's Exhibit 4?
24  **A.**   I do.
25  **Q.**   Okay.  And do you recognize Plaintiff's Exhibit 4 as an

1    e-mail and attachment that you received from Mr. Rigg?
2    **A.**    It appears so, from Rigg, May 27 of '17.
3    **Q.**    Yes.
4    **A.**    Yes.
5    **Q.**    All right.  Now, I also want you to look at -- for
6    reference purposes, I also want you to look at Plaintiff's
7    Exhibit number 8.  And I'll have you pull that out, as well.
8    **A.**    Okay.
9    **Q.**    And please let us know when you have that.
10   **A.**    Got it.
11   **Q.**    Okay.  Now, Plaintiff's Exhibit number 8 looks to be an
12   e-mail that you sent to Mr. Casey [sic] in December of 2017,
13   correct?
14   **A.**    I sent it to Mr. Rigg December 18th of 2017, correct.
15   **Q.**    Yes.  And so, if we compare the attachments, which I've
16   asked you to do before the hearing here today, can you tell
17   us how these two compare, which one pre-dated the other?
18   **A.**    I don't recall that, actually.
19   **Q.**    Okay.  Let me -- let me let you look on Exhibit number
20   8, which you see where it sayings, The book agreement,
21   April 26, 2017".  Do you see that?
22   **A.**    Yeah.  I'm looking -- I'm looking at the agreement.
23   Page -- Page 3 of Exhibit 8.
24   **Q.**    Okay.  And if you look at Page 2 in the exhibit line,
25   it says, "Book agreement, version 3, April -- or V-3,

1  act on behalf of Mr. Williams?
2  **A.**  No.
3  **Q.**  In terms of being able to agree on anything?
4  **A.**  No.  No.  That was never my intention.  It was never
5  Woody's intention.  I was simply go-between and a grandson
6  trying to -- trying to help make this happen.
7  **Q.**  You would take this back to Mr. Williams at some point
8  for his approval?
9  **A.**  Correct.
10  **Q.**  Okay.
11        MR. MAHANEY:  Move the admission of Plaintiff's 8
12  at this time.
13        MR. HANCOCK:  No objection.
14        THE COURT:  Plaintiff's 8 may be admitted.
15              **PLAINTIFF EXHIBIT 8 ADMITTED**
16        BY MR. MAHANEY:
17  **Q.**  Sir, if you could, let's take a look at Plaintiff's 9.
18  **A.**  Okay.
19  **Q.**  Please let me know when you have it.
20  **A.**  1.1 final revised?
21  **Q.**  Yes?
22  **A.**  Yes.
23  **Q.**  Correct.  Begins "1.1 final revised".
24  **A.**  December 19th, yeah.
25  **Q.**  Okay.  And do you have four pages to that -- five pages

1      MR. MAHANEY: Your Honor, I would move the
2  admission of Plaintiff's 6 at this time.
3      MR. HANCOCK: No objection to Plaintiff's 6.
4      THE COURT: Plaintiff's 6 may be admitted.
5               **PLAINTIFF EXHIBIT 6 ADMITTED**
6      BY MR. MAHANEY:
7  Q.   Just a couple of final questions, Mr. Casey. Was there
8  ever any agreement that you were aware of between yourself
9  and Mr. Rigg or Mr. Williams and Mr. Rigg that -- where the
10 parties agreed to change what is identified as Paragraph 6
11 in Exhibit number 6?
12 A.   No.
13 Q.   To your knowledge, did Mr. Rigg propose a change,
14 change proposed language that would take away Mr. Williams'
15 right to mutually agree or to consent to the content of the
16 book?
17 A.   Yeah, he did. He -- you know, things began to change,
18 you know, and there were -- evidently, he had spoken to a
19 couple of other authors that I guess persuaded him that the
20 final -- final consent and several other things related to
21 the book were -- were not necessary on his part. So, some
22 of those -- some of the things that we -- we had agreed to,
23 he seemed to be -- be backing off of and had some concerns
24 about that.
25 Q.   To your knowledge, as we get into 2019 and into 2020,

1  did Mr. Rigg submit any versions of the manuscript or the
2  book that became the *Flamethrower* book to either you or Mr.
3  Williams, to your knowledge, for review or consent?
4  **A.**   No.
5  **Q.**   Do you have any -- do you know whether or not either
6  you or Mr. Williams provided any consent to Mr. Rigg or
7  anyone on his behalf that would allow him to publish the
8  current version of *the Flamethrower* book that was published?
9  **A.**   Absolutely not.
10         MR. MAHANEY:  Those are all the questions that I
11  have of Mr. Casey at this time.
12         THE COURT:  Cross examination.
13         MR. HANCOCK:  Excuse me.
14                      **CROSS EXAMINATION**
15         **BY MR. HANCOCK:**
16  **Q.**   Mr. Casey, this is Tom Hancock.  Can you hear me okay?
17  **A.**   Yes, sir.
18  **Q.**   Hey, because we're on the telephone today, if I break
19  up when I'm asking you a question, or if you just don't
20  understand what I'm asking, if I ask a bad one, which may
21  happen from time to time, I want you to please let me know
22  and I'll try to repeat my question.  That way, you can get a
23  question that you can answer, okay?
24  **A.**   Absolutely.  Yes, sir.
25  **Q.**   I want to go back and follow up on a few things that

1            THE WITNESS: All right.

2     **HERSHEL WOODROW "WOODY" WILLIAMS, PLAINTIFF, SWORN**

3                 **DIRECT EXAMINATION**

4            **BY MR. MAHANEY:**

5    **Q.**    Sir, and state your name for the record, please.

6    **A.**    Hershel "Woody" Williams.

7    **Q.**    And what is your current address?

8    **A.**    3450 Wire Branch Road, Ona, West Virginia.

9    **Q.**    And your age, sir?

10    **A.**    96.

11    **Q.**    Okay. Do you know Bryan Mark Rigg?

12    **A.**    I do.

13    **Q.**    We heard Mr. Casey's testimony a few minutes ago. We

14 won't go back through all of that, but would it be the case

15 that you first met him in or around 2015 on a trip to Guam

16 and Iwo Jima?

17    **A.**    That is true.

18    **Q.**    Okay. Now, at some point in or around that time, do

19 you recall having conversations with Mr. Rigg about the

20 possibility of him writing a book about you?

21    **A.**    I think the conversation was more between Brent --

22    **Q.**    Okay.

23    **A.**    -- and I don't remember having any particular

24 discussion with him on that trip.

25    **Q.**    Okay. Do you recall, when you got back, do you recall

1 having discussions with him about conditions under which --
2 or that would have to be satisfied for him to be able to
3 write a book about you and for you to participate with that?
4 **A.** Yes, absolutely.
5 **Q.** Okay. And what were those conditions?
6 **A.** Well, the first one, of course, was the stipulation
7 that it had to be factual.
8 **Q.** Okay.
9 **A.** It had to be the truth. It wasn't -- there was so much
10 that had been printed in other articles that were not
11 totally factual, so I wanted that, and that I would have
12 final say-so or final review of the book before it was
13 published.
14 **Q.** Okay.
15 **A.** So I could make sure that it was factual.
16 **Q.** Did you -- and that you agreed with the content and the
17 language?
18 **A.** That's right.
19 **Q.** Did you communicate that to Mr. Rigg?
20 **A.** I did.
21 **Q.** And then what was his response? Did he agree to those
22 terms if you moved forward?
23 **A.** Well, he didn't disagree, so I take it -- I took it
24 that he did agree.
25 **Q.** Okay. Well, when you say "he didn't disagree", I mean,

1 "Line 3, Page so-and-so" and, "This needs to be changed, or
2 eliminated", or something, whatever.
3 **Q.** Okay.
4 **A.** So, we did a lot of that.
5 **Q.** And that continued on for a period of time?
6 **A.** Yes, it did.
7 **Q.** Let's talk about -- do you recall there being a meeting
8 up here in West Virginia at the Holiday Inn in July of 2017?
9 **A.** Very well, yes.
10 **Q.** Tell the Court what you remember about that meeting,
11 who was there and what you all talked about.
12 **A.** Okay. Well, I felt that we needed to come to some kind
13 of an agreement where we both signed something. But I -- I
14 was in business for a number of years. That was one of the
15 things that I stipulated and, fortunately, of course, in my
16 business, when we came to an agreement, we would sign
17 something to say we were agreeing. And so, I certainly
18 agreed to that and when he came here, why, I had all my
19 family, all except one grandson who lived in Kentucky. They
20 were all there. And he was there on the phone, my grandson.
21 **Q.** When you say your family, who all was there? Who does
22 that consist of?
23 **A.** Well, I had grandsons, three grandsons, Bryan Casey,
24 Todd Graham, Brent Casey were there. My daughter Travie and
25 my daughter Tracie were there. And Bryan.

1  would have come up again as something you would have talked
2  about there in that meeting of December of -- or February of
3  2017?
4  A.  Yes.
5  Q.  Okay.  The next paragraph down, it says that, "The
6  final decision on the book content will be the
7  responsibility of Hershel Williams."  Do you see that?
8  A.  Yes, I do.
9  Q.  In other words, you got to make the decision as to what
10 the final content of the book was?
11 A.  Yes.
12 Q.  If it's listed here on Exhibit 3, does that mean that
13 you all talked about it that day?
14 A.  No doubt.  Yes.
15 Q.  Okay.  And just so that we're clear, did Mr. Rigg
16 indicate that he agreed with that, that he was okay with you
17 having consent?
18 A.  Yes.
19 Q.  Okay.
20 A.  Yes.
21 Q.  Did he do anything to tell you in any way that he
22 disagreed with that?
23 A.  Absolutely not.
24 Q.  Now, we go down to the last paragraph here, or the next
25 to last paragraph that says, "The agreement must be written

1  so as to protect both the author's rights and the rights of
2  the person and family of the person in the story."  Do you
3  see that?
4  **A.**   Yes, I do.
5  **Q.**   And, basically, you want everybody to be taken care of;
6  everyone's rights protected in some way?
7  **A.**   Absolutely.
8  **Q.**   And is that something that you talked about, as well?
9  **A.**   Yes.
10 **Q.**   And Mr. Rigg agreed with that?
11 **A.**   I assume he did.
12 **Q.**   Okay.  You don't have any reason to believe that he
13 didn't?
14 **A.**   That would be correct, yes.
15             MR. MAHANEY:  Your Honor, I would move the
16 admission of Exhibit 3 at this time, Plaintiff's 3.
17             THE COURT:  Any objection?
18             MR. HANCOCK:  No objection.
19             THE COURT:  All right.  Exhibit 3, Plaintiff's
20 Exhibit 3, may be admitted.
21                  **PLAINTIFF EXHIBIT 3 ADMITTED**
22             BY MR. MAHANEY:
23 **Q.**   Now, as time passed, you went ahead and continued after
24 -- after February of 2017, you continued to provide Mr. Rigg
25 additional information as he requested?

| | |
|---|---|
| 1 | **A.** Yes. |
| 2 | **Q.** And there would be times that he would call up on the |
| 3 | phone or send you additional drafts and you continued to |
| 4 | perform and do that, right? |
| 5 | **A.** That's correct. |
| 6 | **Q.** Okay. Now, I take it that -- did you have an |
| 7 | understanding that in terms of the contract or the agreement |
| 8 | that you referenced that your grandsons were working with |
| 9 | Mr. Rigg to develop that? Did you have an understanding |
| 10 | that that was taking place? |
| 11 | **A.** Yes, I did. |
| 12 | **Q.** Okay. And you weren't directly involved in that, but |
| 13 | they were keeping you aware of what was going on? |
| 14 | **A.** Yes. Right. |
| 15 | **Q.** Okay. Ultimately, did they -- did they present you |
| 16 | with a copy of an agreement that Mr. Rigg had signed for you |
| 17 | to review? |
| 18 | **A.** Yes. |
| 19 | **Q.** Let me show you what we've previously admitted as |
| 20 | Plaintiff's Exhibit number 6. And I'll let you take a look |
| 21 | at that, sir. Do you recognize Exhibit number 6? |
| 22 | **A.** I do. |
| 23 | **Q.** Okay. Now, there's a signature on there under Hershel |
| 24 | Woodrow Williams. |
| 25 | **A.** Yes. |

1   **Q.**   Dated 1/20/18?

2   **A.**   Correct.

3   **Q.**   Is that your signature?

4   **A.**   That is my signature.

5   **Q.**   Did you -- and did you sign that on that date, Exhibit

6   number 6?

7   **A.**   I did.

8   **Q.**   Okay. Do you know what became of this document,

9   Exhibit 6, after you signed it?

10  **A.**   I'm not positive. I think, and my grandson, son or my

11  daughter, I think she has the copy.

12  **Q.**   The original?

13  **A.**   Yeah. I think.

14  **Q.**   Okay.

15  **A.**   But I don't know that for sure.

16  **Q.**   Let me ask you to take a look here at Paragraph number

17  6.

18  **A.**   Okay.

19  **Q.**   It says that, "The book will be a collaborative effort

20  by all parties noted above. Mr. Williams and author Mr.

21  Rigg shall mutually decide on the book content, title and

22  when the book is complete and ready to be published. The

23  design, format and style of the book, including text,

24  photos, graphic material and dust jacket art will be

25  mutually developed." Do you see that?

| | |
|---|---|
| 1 | **A.** Yes, sir. |
| 2 | **Q.** And was that consistent with your understanding and |
| 3 | your agreement with Mr. Rigg throughout the time that you |
| 4 | had the relationship with him in working on the book? |
| 5 | **A.** Absolutely. |
| 6 | **Q.** Okay. And in terms of providing him information, did |
| 7 | you rely upon -- on that agreement in performing your end of |
| 8 | the bargain in providing him information? |
| 9 | **A.** Absolutely. |
| 10 | **Q.** To your knowledge, did you ever agree to anything any |
| 11 | different, any agreement that would have allowed the book to |
| 12 | be published without your consent? |
| 13 | **A.** No. I would not have done that. |
| 14 | **Q.** In 2019 and 2020, I know that there was a time that you |
| 15 | were getting drafts of the book to review and to consent to. |
| 16 | In 2019 or 2020, did Mr. Rigg submit any drafts of the |
| 17 | *Flamethrower* book or a book about your life to you for your |
| 18 | review and consent? |
| 19 | **A.** I have a transcript, or pages, something like 600-some |
| 20 | pages, but I'm not quite sure whether I got them in '17. I |
| 21 | sure didn't get them in '20. |
| 22 | **Q.** Okay. |
| 23 | **A.** But I may have received those sometime in '18. |
| 24 | **Q.** Okay. You have taken a -- well, I know you haven't |
| 25 | read the whole thing, but you have taken a look at what the |

1  please let me know so I can repeat my question for you?
2  **A.**   Sure enough.  Yes.
3  **Q.**   Okay.  I want to start by asking you a couple of things
4  about the July, 2017 meeting that you told Mr. Mahaney
5  about.  Do you remember telling Mr. Mahaney about the July,
6  2017 meeting?
7  **A.**   No.  I never told him about that until this document.
8  **Q.**   Well, I mean today.  You told us a few minutes ago
9  about the July, 2017 meeting.
10 **A.**   Yes.  We talked about the meeting, yes.
11 **Q.**   Yeah.  You told us that Bryan was there, Bryan Casey,
12 Brent Casey, and your two daughters, I think Tracie and
13 Travie; is that right?
14 **A.**   Yes.  Now, pardon me.  It was in February, not July.
15 **Q.**   Okay.  Okay.  That eliminates a little bit of confusion
16 that I had.  Thank you for clearing that up.
17      I want to go back to Guam.  Was your grandson Brent
18 correct that the first place you met Mr. Rigg was on Guam?
19 **A.**   I think so.  I think that was the first time we met and
20 he had his boys with him.  I don't think I had met him
21 before.  If so, it was probably at a function, and I can't
22 remember everybody you meet at a function.
23 **Q.**   Okay.  You mentioned earlier two terms that were
24 discussed about the book at Guam; one, that it would be
25 factual; and, two, that you would get a chance to sign off

| | |
|---|---|
| 1 | and give your approval.  Do I have that correct? |
| 2 | **A.** You do, yes. |
| 3 | **Q.** Okay.  Was there any discussion when you all were in |
| 4 | Guam what would happen if those two terms came into conflict |
| 5 | with one another? |
| 6 | **A.** Not to my knowledge. |
| 7 | **Q.** Okay.  Was there any discussion at the February, 2017 |
| 8 | meeting that you can recall about what would happen if those |
| 9 | two terms came into conflict with each other? |
| 10 | **A.** Not to my knowledge on that either.  I don't recall |
| 11 | that.  I -- I thought everything was mutual. |
| 12 | **Q.** Okay.  I want to ask you about what's been marked as |
| 13 | Plaintiff's exhibit 3.  This is the one that I think you |
| 14 | typed up and it's dated February 16, 2017. |
| 15 | **A.** Correct. |
| 16 | **Q.** Did you ever send this to Mr. Rigg? |
| 17 | **A.** I did not.  This was notes that I was making for my own |
| 18 | -- my own use so that I wouldn't forget what took place at |
| 19 | that meeting. |
| 20 | **Q.** Okay.  Okay.  So, if Mr. Rigg says he didn't see this |
| 21 | document until the lawsuit, you wouldn't have any reason to |
| 22 | dispute that? |
| 23 | **A.** No.  That's correct. |
| 24 | **Q.** Okay.  I want to ask you about what's been marked as |
| 25 | Plaintiff's Exhibit number 6, if you can pull that out, or |

Case 3:19-cv-00423   Document 111-1   Filed 07/21/21   Page 19 of 19 PageID #: 2449

Hershel Woodrow "Woody" Williams - Cross (Hancock)    72

```
 1   was present and I think she has the original, but I'm -- I'm
 2   not positive of that.
 3   Q.   Which daughter are you speaking about?
 4   A.   Tracie.
 5   Q.   That's with a "c", as in "cat"?
 6   A.   Yeah, correct.
 7   Q.   Okay.  What about the other document, the one that you
 8   -- you typed up after the February, 2017 meeting?  Where is
 9   the original of that?
10   A.   I kept that in my files and I didn't show that to
11   anybody until this hearing came up.
12   Q.   And where is the original of that document?
13   A.   I have it.
14   Q.   Okay.
15   A.   My attorney or nobody else knew that existed until this
16   hearing came up.
17   Q.   Did you give an interview where you detailed some of
18   your story to the World War II museum in New Orleans or in
19   the transcript housed there?
20   A.   I'm not sure I understand that question.
21   Q.   Well, that might not have been a very good question, so
22   let me give it another try, okay?  Is there a transcript of
23   an interview with you that's housed in the World War II
24   museum in New Orleans?
25   A.   Oh, I'm sure there are.  I've been there -- I've been
```