IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

HERSHEL WOODROW "WOODY"
WILLIAMS,

Plaintiff,

v.

BRYAN MARK RIGG, an individual;
STACKPOLE, INC., a Pennsylvania
Corporation; and THE ROWMAN &
LITTLEFIELD PUBLISHING GROUP,
INC., a Delaware Corporation,

Defendant.

Civil Action No.  3:19-CV-00423
Honorable Judge Johnston

## AFFIDAVIT OF BRYAN MARK RIGG

I, Bryan Mark Rigg, declare and say:

1.      I make this Affidavit based on matters within my personal knowledge.   I am over

eighteen years of age and am of sound mind and body.

2.      I am a historian.  In 2015, I began writing a book about the Pacific campaign of World

War II.   While on a trip to Iwo Jima, I met Hershel "Woody" Williams.   As a result, I

interviewed Mr. Williams numerous times.   Although many of his stories were previously

recorded, he did share personal anecdotes about his childhood and family which added to the

narrative of his life which was already publicly known.

3.      During the interviews, certain issues arose where the claims Mr. Williams made were

not supportable, or were even rebutted by, independent verifiable research.  For example, Mr.

Williams was adamant that Corporal Darol E. "Lefty" Lee needed to be interviewed because

1

EXHIBIT C

he witnessed Mr. Williams' heroic acts on Iwo Jima. However, I found that Cpl. Lee had lied about his experiences on Iwo Jima and never witnessed anything Plaintiff did while fighting on the island (as Cpl. Lee was aboard the USS Bayfield being treated for "combat fatigue/shell shock" on the day in question). This discovery helped the World War II Museum stop a historical documentary it was about to do about Mr. Williams and Cpl. Lee once they saw that Cpl. Lee was a "Stolen Valor" case who lied about his combat experiences.

4.      Moreover, this chapter studies the numerous problems with Mr. Williams' MOH with never before seen documentation and analysis. Mr. Williams' Medal of Honor, shockingly, never received the endorsement of Fleet Marine Force commander, Lieutenant General Roy S. Geiger, and his board, Pacific Fleet commander, Admiral Chester Nimitz, and his board or the Commandant of the Marine Corps, General Alexander A. Vandegrift due to the lack of evidence for Mr. Williams' supposed actions. And even more startlingly, Mr. Williams' platoon leader, 2nd Lieutenant Howard Chambers, refused to endorse Mr. Williams for the *Medal*, the very Marine who supposedly witnessed everything Mr. Williams had done. This research shows that these men had reason to worry about the Medal of Honor going to Mr. Williams because it appears much of the information lower level officers relied on to endorse Mr. Williams MOH package actually came from Mr. Williams' own reporting about what he did which violates the regulations. This chapter also explores that Mr. Williams probably received the MOH due to political pressure and not because the Marine Corps felt he warranted it which, in the end, as already mentioned, the Corps at its highest levels *never* supported his MOH. And most surprisingly, this work shows that Mr. Williams probably knows this and has done a lot throughout the years to prevent people from knowing what role he actually played, albeit

2

unknowingly at the time, in he getting the highest medal this nation can bestow on a serviceman because of how he inflated his deeds in battle.

5.      There are other troubling relationships surrounding Mr. Williams' story. He recounts the tale of his close friendship with Vernon Waters and that he was there when he was killed. In reality, the evidence shows he was not there getting the date wrong, the unit out of place (Vernon was in a different company), the cause of death wrong (his head was not blown up by a Type 91 50mm grenade, but rather, Waters was either shot near the bottom of the skull or in the neck), the movement of the lines incorrect (they moved backwards or sideways and not forwards), the handling of Waters remains wrong (body bearers were not observed by Mr. Williams taking Vernon away from the scene since he was left in the open for days thereafter), and, most importantly, the tale of returning Waters' ring to his family left unsubstantiated. Mr. Williams' version is a beautiful story and one that possibly started as a way to impress or entertain his new bride who accompanied him on the journey to Montana and/or later listeners he thought would enjoy such a yarn, but all the evidence shows Mr. Williams was incorrect on almost everything about Waters except that he was tall, well-liked and killed. However, the story that the tallest guy became friends with the shortest in the unit; that they had this sacred pact to return the fallen guy's ring and tell the stories of death to their families in case the Grim Reaper visited them; and that when, in reality, the Reaper did take Vernon in front of Mr. Williams followed by Mr. Williams adhering to their pledge and getting his ring to return to the family is indeed a Hollywood tale. Mr. Williams' tall-tale is one full of power and is the stuff of legend, but there is no support for that version in the document trail uncovered to date. Vernon's nephew George Waters concluded, "It makes me *very angry* that Woody has used my uncle's death to better his image using false stories to do so. He has dishonored the memory of

3

his friend." These are just a few of the problems I discovered. These discrepancies which arose as I researched my book began to drive a wedge between Mr. Williams and myself.

6. In February of 2017, I attended a meeting with Mr. Williams and members of his family. At this meeting, for the first time, money was discussed. I noted that it would be extremely unorthodox for a historian to share book proceeds with a subject in the book, as such an arrangement might lead to accusations that the book was not historically accurate. This meeting, in addition to the revelation about Lefty Lee and several other similar factual inconsistencies in Mr. Williams' story, contributed to erosion of the relationship between Mr. Williams and myself, especially concerning information described in Paragraphs 3)., 4). and 5).

7. As a result of the February 2017 meeting, I asked my attorney, Reid Heller, to draft response to an agreement-draft Mr. Williams' lawyer Dale Egan and his grandson Brent Casey sent me. This Response then was sent to Mr. Casey, Mr. Williams' grandson, and Mr. Williams. They sent back a different agreement. This process continued sometime and is documented in part through email correspondence.

8. We continued to negotiate terms but were unable to reach an agreement acceptable to both sides. On March 7, 2018, I emailed Brent Casey, Mr. Williams and Dale Egan withdrawing all previous offers.

9. Similarly, no oral agreement ever reached. There were many terms Mr. Williams (or his family or attorneys) wanted in the contract that I could not agree to; namely, full control of the copyright of the book, full censoring rights and money for the book without ever considering my up-front cost. Both sides recognized the need for the agreement to be in writing.

10. This week, I was provided documents that Mr. Williams is going to use as exhibits at the upcoming hearing. I reviewed them.

11.     In regard to the chart of footnotes, I reviewed my book to try and determine what portion of the footnotes came from my interviews of Mr. Williams. The book has 3145 footnotes, of which 459 reference Mr. Williams, approximately 15%. Of those, only 192 footnotes reference Mr. Williams' interviews or other original source material from him, approximately 6%. Even among those footnotes, other sources are also cited, and much of the information was available from other sources.

12.     Mr. Williams has been interviewed hundreds of times over the years, numerous articles have been written about his story, and a wealth of publicly available information exists chronicling his story. As a historian, when you can cite a primary source (like an eyewitness), you do not cite the secondary source. This does not mean the secondary source wasn't available. Many times in the book when I cited my interview with Mr. Williams, I could have cited to an article, sermon, lecture, or some other source for the same information.

13.     For example, there are long interviews with Mr. Williams on file with the WWII Museum in New Orleans, Louisiana, the Pacific War Museum in Fredericksburg, Texas, and a two part, very long interview on file at the Marine Corps Historical Division in Quantico, Virginia.   These long interviews are in addition to the hundreds of newspaper articles over the years where Mr. Williams is quoted at length and these same stories are told.

14.     In addition, the notes I took at my interview of Mr. Williams are public record. They are stored at the Marine Corps Historical Division. Copies of all of the original documents that Mr. Williams allowed me to review are also public record at the Marine Corps Historical Division, including his letters to Ruby, personal notes, etc.

15.     I reviewed the documents labeled Exhibit 7A-7J that are portions of the book. These documents provide further examples of how information that was obtained from Mr. Williams

are public information. Exhibit 7G details a story that likewise has been provided many times to other public sources. It appears in the National Archives at NACPM, RG 127 Container 14, Dashiell, Folders 1-2, #201, in Paul Hoolihan, "Flame Throwers Class at 21st Teaches the Art of Roasting Japs," 21st Regt. Newsletter, May 1945, in George Lawless, "of Such Stuff are Heroes," Charleston Gazette, 20 May 1956, in Francois, Bill, "Flame-Throwing Marine Who Won the Medal of Honor," The Man's Magazine, Vol. 14, #1, Jan. 1966; and was discussed in a lecture given by Mr. Williams at the Marine Corps Recruit Depo in the museum at San Diego on 19 Oct. 2017. It is also detailed in the Marine Corps Historical Division in Quantico Virginia, Oral History, Woody Williams 13801B.

16.     Exhibits 7I and 7J detail a story that Mr. Williams has recounted numerous times in public. It is in his oral testimony at the Marine Corps Historical Division. It is recorded in Dashiell's article from 1945, Hoolihan's article from 1945, George Lawless' article from 1956, and Bill Francois's article from 1966. It is repeated in a lecture Mr. Williams gave to the library and museum at the San Diego Marine Recruit Depot in October of 2017.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: 4/3/20 , in the city of Dallas and the state of Texas.

**Bryan Mark Rigg**

STATE OF     Texas

COUNTY OF     Dallas

6

On this the third day of April, 2020, before me the undersigned notary public, personally appeared Bryan Mark Rigg proven to me through satisfactory evidence of identification, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of her knowledge and belief.



SHIRLEY PONDER
My Notary ID # 704134
Expires February 12, 2023

Notary Public
My Commission Expires: 2-12-2023