IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

HERSHEL WOODROW WILLIAMS,

        Plaintiff,

v.   CIVIL ACTION NO. 3:19-cv-00423

BRYAN MARK RIGG, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Bryan Mark Rigg's ("Defendant" or "Rigg") Motion for Summary Judgment. (ECF No. 111.) For reasons more fully explained herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

I.    BACKGROUND

*A. Factual Background*

This matter arises out of a dispute concerning an alleged oral agreement between Rigg and Plaintiff Hershel Woodrow "Woody" Williams ("Plaintiff" or "Williams") over the publication of a book authored by Rigg—*Flamethrower: Iwo Jima Medal of Honor Recipient and U.S. Marine Woody Williams and His Controversial Award, Japan's Holocaust and the Pacific War* (hereinafter "*Flamethrower*"). Rigg, a historian and author, and Williams, a Congressional Medal of Honor recipient, first met during a trip to Guam and Iwo Jima to commemorate the 70th Anniversary of the Battle of Iwo Jima during World War II. (ECF Nos. 122 at 1, 130 at 1.) The two were introduced by Williams' grandson, Brent Casey ("Casey"). (ECF No. 122 at 1.) During this trip, conversation between Rigg and Williams was limited, but Rigg held discussions

with Casey about the possibility of writing a book about the battles, told through the lens of Williams' experience.  (*Id.* at 1–2.)  The parties agree that, at this point, Casey had no authority to bind Williams to any agreement with Rigg, but merely acted as a "go-between" with respect to matters related to the book.  (ECF Nos. 122 at 4, 130 at 4.)

Williams alleges that during these initial conversations, Casey made clear to Rigg that Williams would agree to provide information to Rigg for *Flamethrower* only if Rigg agreed to these terms: (1) that the book be "factual," and (2) that Rigg grant Williams control over the final content of the book.  (*Id.*)  Williams alleges that, during those initial conversations with Casey, Rigg indicated that he was in agreement with Williams' stipulations, and that if Williams moved forward with providing him information to write the book, Rigg promised the book would be "factual" and Williams would have the right to consent to the book's final content.  (*Id.*)

Williams and Rigg would not meet again until July 2016, when Rigg visited Williams' boyhood home and other locations to document Williams' background.  (*Id.* at 6.)  The conversations held during this visit were not centered on any agreement between the parties, but concentrated on Williams' actions in the Pacific Theater during World War II.  (ECF No. 122 at 2.)  Williams and Rigg did not discuss any specifics of an agreement between the two regarding the book during this visit.  (*Id.*)

The next time Williams and Rigg would meet in person was in July of 2017, when the parties—including Casey and other members of Williams' family—met at the Holiday Inn in Barboursville, West Virginia (the "2017 Meeting").  (*Id.*)  The purpose of the 2017 Meeting, according to Rigg, was to reach "some form of an agreement about the book and the residuals of the book" and was the first time those issues were discussed in any detail.  (*Id.*)  Williams,

likewise, agrees that the purpose of the 2017 Meeting was "to come to some kind of an agreement where [the parties] both signed something," and that a signed written agreement was something he "stipulated" for the parties to continue their relationship. (ECF Nos. 122 at 2, 131-4 at 57.) In fact, according to Casey, "everybody recognized" the need for a written contract, and that "gentlemen's handshake" agreements were not how he and Williams did business. (ECF No. 131-4 at 41.)

By May of 2017, the parties had begun exchanging written drafts of "proposed contracts." (ECF No. 130 at 7.) Several drafts were exchanged between the parties, each draft containing edits and revisions the parties sought to include in the final written contract. (ECF Nos. 122 at 3, 130 at 7.) Throughout these negotiations, Casey continued to work as the "go-between" for Williams on issues relative to *Flamethrower*, including on issues relating to the negotiation of the proposed written contracts. (ECF No. 130 at 7.) Rigg and Casey continued negotiating to finalize a written contract through the end of 2017. (*Id.*)

On January 13, 2018, Rigg e-mailed Casey a version of a written contract, entitled "Book Agreement," with his signature affixed to it. (*Id.* at 8; *see also* ECF No. 69-9.) This version was signed by Williams on January 20, 2018. (ECF No. 130 at 8; *see also* ECF No. 69-9.) Critically, however, Williams and Casey *never* returned or communicated to Rigg this version of the written contract with the parties' signatures affixed to it, and the parties continued negotiating the proposed terms of the written contract. (ECF No. 130 at 8.)

Eventually, these contract negotiations deteriorated when, according to Rigg, Williams and Casey required certain terms to be included in the written contract. (ECF No. 122 at 4.) Specifically, Rigg alleges that he and Casey could not reach an agreement over who would have

3

final editorial control of the book, and financial issues remained a problem. (*Id.*) Rigg also alleges that Williams began to object to the inclusion of factual content—supported by documentary evidence—in the book, despite agreeing the book should be "factual." (*Id.*) According to Rigg, these issues between the parties caused their relationship to "strain past its breaking point," and all negotiations between the parties regarding the book ceased. (*Id.*)

Although the parties' no longer worked together, Rigg continued working on *Flamethrower*, and intended to publish it based on the research he had done. (*Id.*) Williams, however, alleges that Rigg "decided to change the book from one that appropriately lauded Mr. Williams' life and service to his country, to one that vilified him as a liar and felon." (ECF No. 130 at 9.) Specifically, Williams alleges that Rigg "overhaul[ed] the book to portray Mr. Williams negatively as a liar, a felon and as someone who did not deserve to receive or hold the Medal of Honor." (*Id.* at 11.) On March 20, 2020, Rigg self-published *Flamethrower*, offering it for sale on Amazon. (ECF No. 122 at 5.) As of August 25, 2021, approximately 1,400 hard copies and over 500 electronic copies of *Flamethrower* have been sold. (ECF No. 131-1 at 296.)

B. Procedural Background

Based on the above allegations, Williams initiated this action against Rigg on May 31, 2019. (ECF No. 1.) On January 23, 2020, Williams amended his complaint to name Rigg's publishers as defendants. (ECF No. 59.) In his Amended Verified Complaint, Williams alleged six causes of action, only two of which remain: Count II for Breach of Contract against Rigg; and Count III for Promissory Estoppel/Detrimental Reliance against Rigg. (*See* ECF No. 124 at 12.)

Rigg filed his Motion for Summary Judgment on July 21, 2021. (ECF No. 111.) On August 12, 2021, the parties jointly moved to amend the scheduling order, which moved the

deadline for Williams to respond to Rigg's Motion for Summary Judgment to September 15, 2021. (ECF No. 116.) On September 15, 2021, Williams filed an unopposed Motion for Extension of Time to Respond to September 20, 2021, (ECF No. 126), which the Court granted on September 16, 2021, (ECF No. 127). Williams filed a Second Motion for Extension of Time to Respond to Rigg's Motion for Summary Judgment to September 23, 2021.[1] (ECF No. 128.) Williams filed his Response on September 23, 2021, (ECF No. 130), and Rigg filed his Reply on September 30, 2021, (ECF No. 132). Accordingly, Rigg's Motion for Summary Judgment has been fully briefed and is now ripe for adjudication.

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various

---

[1] Insofar this motion was unopposed by Rigg, for good cause shown, the Court **GRANTS** Plaintiff's motion, (ECF No. 128).

5

documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III. DISCUSSION

Rigg moves this Court to grant summary judgment in his favor on both of Williams' remaining claims. (*See* ECF No. 111.) The only claims remaining from Williams' Amended Verified Complaint are Count II for Breach of Contract and Count III for Promissory Estoppel/Detrimental Reliance. Williams opposes Rigg's motion, arguing that a valid, enforceable contract exists between he and Rigg, and that he relied to his detriment on promises made by Rigg to Casey during the 2015 trip to Iwo Jima and Guam. The Court begins its analysis with Williams' breach of contract claim before addressing Williams' promissory estoppel claim.

*A. Breach of Contract*

Rigg argues that summary judgment should be granted in his favor on Williams' breach of contract claim. To establish a claim for breach of contract, a party must prove the following four

6

elements: "(1) that a valid, enforceable contract exists; (2) that the plaintiff has performed under the contract; (3) that the defendant has breached or violated its duties or obligations under the contract; and (4) that the plaintiff has been injured as a result of a breach." *Remsberg v. Docupak*, No. 3:12-CV-41, 2013 WL 704657, at *6 (N.D. W. Va. Feb. 27, 2013) (citing *Executive Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694, 714 (S.D. W. Va. 2009)).

Rigg argues that summary judgment should be granted in his favor on Williams' breach of contract claim for three reasons. First, Rigg argues that Williams' has suffered no damages resulting from any alleged breach by Rigg. (ECF No. 122 at 7–8.) Second, Rigg asserts that no enforceable contract exists between the parties and, should the Court find that one exists, Williams breached it first and cannot enforce it. (*Id.* at 8–11.) Third, Rigg contends that the Statute of Frauds prohibits Williams' breach of contract claim. (*Id.* at 16–17.) The Court first addresses whether a contract ever existed.

Rigg argues that summary judgment should be granted in his favor because no valid, enforceable contract—whether oral or written[2]—exists between the parties. (ECF No. 122 at 8.)

---

[2] The parties agree that no *written* contract was ever formed between them. (ECF Nos. 122 at 4, 130 at 8–9.) Nevertheless, a version of a written agreement entitled "Book Agreement" with both Rigg's and Williams' signatures affixed to it is in the record. (*See* ECF No. 69-9.) This purported contract is unenforceable.

Under West Virginia law, it is a well-settled principle that an acceptance is not valid until it is communicated to the other party. *See* Syl. Pt. 6, *McCully's Adm'r v. Phoenix Mut. Life Ins. Co.*, 18 W. Va. 782 (1881) ("A contract cannot bind the party proposing it, until the acceptance of the other party is in some way actually or constructively communicated to him."). Here, Rigg e-mailed this version of the written contract with his signature affixed to it on January 13, 2018 to Casey. (ECF No. 130 at 8.) Upon receipt, Williams signed his name to this version of the written contract on January 20, 2018. (*Id.*) However, Williams and Casey never returned the fully signed version of the written contract to Rigg and continued negotiating the terms of the written contract. (*Id.*)

Because Williams and Casey never communicated to Rigg their intentions to be bound by the version of the contract with Rigg's signature affixed to it, but rather continued negotiating the terms of the written contract, Williams never accepted Rigg's offer to be bound by the version of the written contract sent on January 13, 2018. *See Stark Elec. v. Huntington Hous. Auth.*, 375 S.E.2d 772, 774 (W. Va. 1988) ("A party to whom an offer of contract is made must either accept it wholly or reject it wholly. A proposition to accept on terms varying from those offered is a rejection of the offer, and a substitution in its place of the counter proposition. It puts an end to the negotiation so far as the original offer is concerned."). Therefore, no valid, enforceable written contract between the parties exists.

Specifically, Rigg argues that "no enforceable contract exists because there was no meeting of the minds regarding the terms of the agreement." (*Id.* at 9.)

Whether a contract exists is generally a question of fact reserved for the jury, but the question may be removed from the jury's consideration when the plaintiff has failed to establish a *prima facie* right of recovery. *Thacker v. Peak*, 800 F. Supp. 372, 382–83 (S.D. W. Va. 1992) (citing Syl. Pt. 4, *Cook v. Heck's Inc.*, 342 S.E.2d 453 (W. Va. 1986)). For a valid and enforceable contract to exist, West Virginia law requires "competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract, if there is one of these essential elements upon which the minds of the parties are not in agreement." *Ways v. Imation Enterprises Corp.*, 589 S.E.2d 36, 44 (W. Va. 2003) (citing Syl. Pt. 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 131 S.E. 253 (W. Va. 1926)).

"A meeting of the minds is a *sine qua non* of all contracts." *Riner v. Newbraugh*, 563 S.E.2d 802, 804 (W. Va. 2002). "The contractual concept of 'meeting of the minds' or 'mutual assent' relates to the parties having the same understanding of the terms of the agreement reached." *Messer v. Huntington Anesthesia Grp., Inc.*, 664 S.E.2d 751, 759 (W. Va. 2008) (citation omitted). For "mutual assent" to exist, "it is necessary that there be a[n] . . . offer on the part of one party and an acceptance on the part of the other." *Bailey v. Sewell Coal Co.*, 437 S.E.2d 448, 450 (W. Va. 1993). "Both the offer and acceptance may be by word, act or conduct that evince the intention of the parties to contract." *Id.* at 450–51. Mutual assent "may be shown by direct evidence of an actual agreement or by indirect evidence through facts from which an agreement may be implied." *Bailey*, 437 S.E.2d at 451.

8

"While a valid contract may be made between parties by memorandum, telegrams, and correspondence, care should be taken not to construe as an agreement that which the parties only intended to be a *preliminary negotiation*." *Blair v. Dickinson*, 54 S.E.2d 828, 844 (W. Va. 1949) (emphasis added). Furthermore, "when it is shown that the parties intended to reduce a contract to writing this circumstance creates a presumption that no final contract has been entered into, which requires strong evidence to overcome." *Sprout v. Bd. of Educ. of Cnty. of Harrison*, 599 S.E.2d 764, 768 (W. Va. 2004) (quoting *Blair*, 54 S.E.2d at 844); *see also Cabot Oil & Gas Corp. v. Daugherty Petroleum, Inc.*, 479 F. App'x 524, 529 (4th Cir. 2012) (noting that the parties' correspondence did not create a binding agreement in the absence of a formal written contract because the parties manifested their mutual intention to memorialize any agreement in a formal written contract).

Here, all parties involved manifested their intentions that any enforceable agreement between them be reduced to a formal written contract. (*See* ECF No. 131-1 at 171–72; ECF No. 131-3 at 13; ECF No. 131-4 at 41, 57.) Specifically, at an evidentiary hearing before this Court on April 6, 2020, Williams himself testified during direct examination as follows:

| | |
|---|---|
| MAHANEY: | Let's talk about -- do you recall there being a meeting up here in West Virginia at the Holiday Inn in July of 2017? |
| WILLIAMS: | Very well, yes. |
| MAHANEY: | Tell the Court what you remember about that meeting, who was there and what you all talked about. |
| WILLIAMS: | Okay. Well, I felt that we needed to come to some kind of an agreement where we both signed something. But I -- I was in business for a number of years. That was one of the things that I stipulated and, fortunately, of course, in my business, when we came to an agreement, we would sign something to say we were agreeing. |

(See ECF No. 131-4 at 57.) Furthermore, Casey testified at the same evidentiary hearing during cross-examination as follows:

> HANCOCK: And you all recognized that you needed a written contract here, right?
>
> CASEY: Yes. I think we both -- everybody recognized it.

Subsequently, during his deposition on August 31, 2021, Casey elaborated on his prior testimony at the evidentiary hearing when he said that it "was the full intention . . . of both parties" that they reach a final, signed written contract, and that this intention was evidenced by the parties "passing back and forth contracts for six, eight or ten months by that point." (ECF No. 131-3 at 13.) Therefore, both parties clearly manifested an intention to reduce their contractual negotiations to writing, creating a presumption that—absent a formal, written contract—the parties never formed a binding oral agreement. To establish a valid and enforceable oral contract between he and Rigg, Williams must present "strong evidence" to overcome the presumption that no final contract had been entered into absent a formal, written contract.

Williams has failed to present "strong evidence" to overcome this presumption. In his Response, Williams devotes only one paragraph to illustrate the alleged circumstances giving rise to a valid, enforceable contract between he and Rigg. (ECF No. 130 at 17.) Williams argues that "[t]he fact that both parties agreed to a version of the written contract by affixing [their] signatures to the exact same version of the exact same contract is sufficient to create a triable issue of fact as to whether the parties reached an agreement to the essential elements of a contract." (*Id.*) However, Williams' reliance on this fact is misguided insofar as the contract to which Williams signed his name was never sent back or communicated to Rigg, but rather, the parties continued

negotiating the terms of the proposed agreement. (*Id.* at 8.) These circumstances do not establish a "meeting of the minds" between the parties. Rather, these circumstances only establish a series of ongoing preliminary negotiations, during which neither party ever communicated to the other that they were *wholly* agreeable to any of the proposed contracts.

Williams' argument that a binding oral contract was formed based upon Rigg's discussions with Casey during the 2015 trip to Guam and Iwo Jima is also unavailing. At no time during the parties' negotiations did Casey have authority to bind Williams to any agreement. Casey testified as such during his deposition on August 31, 2021. (ECF No. 131-3 at 9.) Rather, he acted as a "go-between" in terms of communicating with Rigg regarding the book. (*Id.*) Therefore, Williams' argument that a binding oral contract was reached during the 2015 trip to Guam and Iwo Jima fails because Casey had no authority to bind him to any agreement with Rigg.

Accordingly, because no valid, enforceable contract was ever formed between the parties, no genuine issue of material fact exists with respect to Williams' breach of contract claim. As such, the Court **GRANTS** summary judgment to Rigg as to Williams' Count II Breach of Contract claim.[3]

B. *Promissory Estoppel*

Rigg also argues that summary judgment in his favor is warranted with respect to Williams' promissory estoppel claim. (ECF No. 122 at 7, 12–16.) In West Virginia, a promissory estoppel claim requires the plaintiff to prove the following:

> (1) a promise; (2) reasonable reliance on the promise by the plaintiff; (3) that it was foreseeable to the defendant that the plaintiff would rely on the promise; (4) that the plaintiff suffered damages as a result of her reasonable reliance upon the

---

[3] Because the Court finds that there is insufficient evidence of a contract in this case, it need not address the parties' arguments regarding contractual damages and the Statute of Frauds.

11

> promise of the defendant; and (5) under a circumstance that injustice can only be avoided through enforcement of the promise.

*Koerber v. Wheeling Island Gaming, Inc.*, No. 5:12CV97, 2013 WL 162669, at *4 (N.D. W. Va. Jan. 15, 2013) (citing *Everett v. Brown*, 321 S.E.2d 685 (W. Va. 1984)).

Rigg argues that Williams' promissory estoppel claim fails for five reasons. First, Rigg argues Williams' promissory estoppel claim fails "for want of a promise." (ECF Nos. 122 at 12, 132 at 7–8.) Second, Rigg argues Williams' promissory estoppel claim fails because it was unforeseeable that Williams would "rely on an uncommon definition of 'factual' to determine his own role in the project." (ECF No. 122 at 12.) Third, Rigg argues Williams' promissory estoppel claim fails due to the doctrine of unclean hands. (*Id.*) Fourth, Rigg argues Williams has suffered no damages resulting from Rigg's breach of any alleged oral promise. (*Id.* at 7–8.) Finally, Rigg argues that the Statute of Frauds prohibits Williams' promissory estoppel claim. (*Id.* at 16.) For the reasons explained more fully below, this Court finds that genuine issues of material fact exist with respect to Williams' promissory estoppel claim, precluding summary judgment in Rigg's favor.

1. Promise

Rigg first argues that Williams' promissory estoppel claim fails "for want of a promise." (ECF No. 132 at 7.) Rigg cites Williams' deposition, during which Williams testified that he "remembers no promises from Rigg concerning the book or anything else before the 2017 meeting in Barboursville to attempt to negotiate a contract." (ECF No. 132 at 7.) Williams, however, argues that Rigg made oral promises to Casey during the 2015 trip to Iwo Jima and Guam under circumstances where Rigg understood these promises would be communicated to Williams. (ECF No. 130 at 18.) Specifically, Williams argues that Rigg made an oral promise to Casey that

"the book would be factual and [Williams] would [have] the right to consent to the final content of the book" if Williams "moved forward with providing him information to write the book." (*Id.* at 4.) Rigg does not dispute that he held discussions with Casey during the 2015 trip to Iwo Jima and Guam about the possibility of an agreement regarding a book. (ECF No. 122 at 2.)

Under West Virginia law, a promissory estoppel claim requires "a promise which the promisor should reasonably expect to induce action . . . on the part of the promisee *or a third person*. . . ." *Everett*, 321 S.E.2d at 689 (emphasis added). Here, based upon the parties' briefings, there is a genuine issue of material fact as to whether Rigg made an oral promise to Casey during the 2015 trip to Iwo Jima and Guam, and whether Rigg understood that this oral promise would be communicated to Williams. Specifically, Williams has presented evidence that Rigg promised Casey that if Williams provided information enabling him to write *Flamethrower*, he would ensure that the book was "factual" and he would grant Williams the right to consent to the final content of the book. (ECF No. 130 at 4.) Although these promises were not made directly to Williams, the record establishes that Casey acted as a "go-between" between Rigg and Williams, and that Rigg understood that any conversation regarding the book between he and Casey would be communicated to Williams. (*Id.*) Thus, Williams has provided sufficient evidence to create a genuine issue of material fact as to whether Rigg made an oral promise to Casey, which was understood by Rigg to be communicated to Williams.

2. Williams' Reliance

Next, Rigg argues Williams' promissory estoppel claim fails because it was unforeseeable that Williams would "rely on an uncommon definition of 'factual' to determine his own role in the project." (ECF No. 122 at 12.) Williams contends that the question as to whether his reliance

13

on Rigg's promises was reasonable is a question for the jury. This Court agrees that a genuine issue of material fact exists as to whether Williams' reliance on the conversations between Rigg and Casey during the 2015 trip to Iwo Jima and Guam was reasonable. There is ample evidence to create issues of fact regarding reasonable foreseeability and the parties' understanding of the term "factual" and Williams' role in approval of the final content of the book. Whether Williams' reliance on these alleged promises was reasonable is a question for the jury to consider, and a reasonable jury considering the question could find in Williams' favor.

3. Unclean Hands

Next, Rigg argues Williams' promissory estoppel claim fails due to the doctrine of unclean hands. (ECF No. 122 at 12.) Under West Virginia law, "it is axiomatic that one who seeks equity must have clean hands." *St. Luke's United Methodist Church v. CNG Dev. Co.*, 663 S.E.2d 639, 647 (W. Va. 2008). Under the doctrine of unclean hands, "whenever and if it is made to appear to the court that by reason of . . . unconscionable conduct, the plaintiff has lost his right to invoke a court of equity, the court will, on the motion of a party . . . wash its hands of the whole." *Hassan G. v. Tamra P.*, 853 S.E.2d 577, 585 (W. Va. 2020).

Rigg argues that he and Williams held mutual obligations to one another to ensure that Flamethrower was "factual," and that Williams broke his own promise when he objected to the inclusion of material in *Flamethrower* that Rigg believed to be factual. (ECF No. 122 at 15–16.) Williams contends that he never insisted that anything be taken out of *Flamethrower* prior to Rigg's alleged breach because it was never provided to him, and that the issue of unclean hands is also a jury question. (ECF No. 130 at 18.)

With regard to Rigg's invocation of the doctrine of unclean hands, there are several genuine

issues of material fact precluding summary judgment on this issue. First, there is a genuine issue of material fact as to whether Williams' agreement that he would provide information to Rigg for *Flamethrower* also included an obligation to consent to the inclusion of all factual information Rigg wished to include in *Flamethrower*. Based upon the parties' briefings, a reasonable jury could conclude that Williams' only obligation to Rigg was to provide him with information—via interviews, personal documents, and other sources—to enable him to write the book. A reasonable jury could conclude that Williams did not promise to consent to the inclusion of all factual information about his life that Rigg wished to include in *Flamethrower*.

Second, there is a genuine issue of material fact as to whether Williams' objection to the inclusion of information that Rigg believed to be factual constitutes a breach of any obligation Williams owed to Rigg. A reasonable jury could find that Williams was merely asserting his right to consent to the final content of the book, rather than breaching an obligation to ensure *Flamethrower* contained all of the factual information Rigg wished to include.

Third, a genuine issue of material fact exists as to whether Williams fully performed the obligations asked of him. Certainly, this question of fact depends on whether Williams owed Rigg any obligations beyond providing him with information to write *Flamethrower*—which, as discussed above, could be resolved by a reasonable jury in Williams' favor. However, depending on the resolution of that question, a reasonable jury could also conclude that Williams fully performed all obligations owed to Rigg.

Therefore, based upon the record before the Court, a reasonable jury could find for Williams with respect to each of these questions, precluding summary judgment in Rigg's favor on the issue of unclean hands.

4. <u>Promissory Estoppel Damages</u>

Next, Rigg argues that Williams' promissory estoppel claim fails because Williams has suffered no damages. (ECF No. 122 at 7.) To establish a claim under promissory estoppel, Williams must prove "that [he] suffered damages as a result of [his] reasonable reliance upon the promise of the defendant." *Koerber*, 2013 WL 162669, at *4. Although the West Virginia Supreme Court of Appeals has not considered the particular remedies available in a promissory estoppel claim, the remedy granted for breach is to be limited as justice requires. *Everett*, 321 S.E.2d at 689 (citing *Restatement (Second) of Contracts* § 139).

Williams argues that he has suffered reliance damages measured by the value of his time in providing information to Rigg and in editing draft manuscripts. (ECF No. 130 at 15.) In response, Rigg contends that Williams' claim for damages in this respect is too speculative. (ECF No. 132 at 3.) However, Williams cites several particular dates on which he gave interviews to Rigg to provide information for *Flamethrower*. (ECF No. 130 at 5.) Specifically, Williams cites in excess of 25 interviews he gave between 2015 and 2018 to provide Rigg with information to write *Flamethrower*. (*Id.* at 1, 5.) While Williams does not attempt to calculate precisely how many hours he spent giving interviews and editing manuscript drafts, he has provided sufficient evidence to create a genuine issue of material fact with respect to the amount of time he gave in reliance on Rigg's oral promises. Based upon the parties' briefings, a reasonable jury could conclude that Williams has established damages associated with his reliance on Rigg's oral promises, therefore summary judgment in Rigg's favor is inappropriate.

5. <u>Statute of Frauds</u>

Finally, Rigg argues that the Statute of Frauds prohibits Williams' promissory estoppel

16

claim. (ECF No. 122 at 16.) The West Virginia Supreme Court of Appeals has held on multiple occasions that a claim for promissory estoppel can exist "notwithstanding the Statute of Frauds." Syl. Pt. 1, *Everett*, 321 S.E.2d 685; *see also Hoover v. Moran*, 662 S.E.2d 711, 719 (W. Va. 2008) (holding that "under the doctrine of promissory estoppel, [Plaintiff] should have his day in court notwithstanding the possible application of the statute of frauds writing requirement . . ."). In determining whether injustice can be avoided only by enforcement of the promise notwithstanding the Statute of Frauds, the following circumstances are significant:

> (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; and (e) the extent to which the action or forbearance was foreseeable by the promisor.

Syl. Pt. 3, *Everett*, 321 S.E.2d 685; *see also Hoover*, 662 S.E.2d at 719.

Here, based upon the above factors, the Statute of Frauds does not preclude Williams' pursuit of his promissory estoppel claim. The only remedy available to Williams is to seek reliance damages under a theory of promissory estoppel for the time he spent providing information about his life to Rigg in reliance on Rigg's guarantee that he would have the right to consent to the final content of *Flamethrower*. As discussed above, Williams cannot seek damages under a breach of contract theory because no oral contract was formed between he and Rigg. Further, Williams' action—providing Rigg with information to write *Flamethrower*—has a definite character insofar as the information Rigg obtained to write *Flamethrower* has already been used and published by Rigg. Based upon the discussions held between Rigg and Casey during the 2015 trip to Iwo Jima and Guam, it was clearly foreseeable to Rigg that if he promised to grant

Williams a right to consent to the final content of the book, that Williams would provide him with the information necessary to write *Flamethrower*. Accordingly, based upon the above factors, this Court finds that the Statute of Frauds does not preclude Williams' promissory estoppel claim, and summary judgment in Rigg's favor is inappropriate.

For the foregoing reasons, the Court finds that a reasonable jury could return a verdict for Williams with respect to his promissory estoppel claim. Viewing the facts in the light most favorable to Williams, genuine issues of material fact exist with respect to Williams' promissory estoppel claim, precluding summary judgment in Rigg's favor. Accordingly, the Court **DENIES** Rigg's Motion for Summary Judgment as to Williams' Count III Promissory Estoppel/Detrimental Reliance claim.

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** Rigg's Motion for Summary Judgment, (ECF No. 111), with respect to Williams' Count II Breach of Contract claim. The Court further **DENIES IN PART** Rigg's motion with respect to Williams' Count III Promissory Estoppel/Detrimental Reliance claim.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: October 27, 2021

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE